**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **H.B., a minor student, through the parents, D.B. and S.B.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**RUTHERFORD COUNTY BOARD OF EDUCATION** *also known as Rutherford County Schools*,<br><br>Defendant. | ) | **Case No. 3:26-cv-00068**<br>**Judge Aleta A. Trauger**<br><br>LEAD CASE |

**CONSOLIDATED WITH:**

| | | |
|---|---|---|
| **RUTHERFORD COUNTY SCHOOLS,**<br><br>**Plaintiff/Counter-Defendant,**<br><br>**v.**<br><br>**H.B., a minor student, through the parents, D.B. and S.B.,**<br><br>**Defendant/Counter-Plaintiff.** | ) | **Case No. 3:26-cv-00071**<br><br>MEMBER CASE |

**MEMORANDUM**

Case No. 3:26-cv-00071 ("Member Case") was consolidated with Case No. 3:26-cv-00068 ("Lead Case"). Both cases concern an underlying special education due process hearing.

H.B., a minor student, through her parents, D.B. and S.B., filed her Complaint in the Lead Case on January 20, 2026 against the Rutherford County Board of Education d/b/a/ Rutherford County Schools ("RCS"). (Lead Case Compl., Doc. No. 1.) On the same day, RCS filed its Complaint against H.B., initiating the Member Case. (Member Case Compl., Doc. No. 1.)

H.B. and RCS have each filed a Motion for Judgment on the Administrative Record[1] with accompanying memoranda. (Lead Case Doc. Nos. 19-20 (RCS); 21-22 (H.B.).) Both parties have filed a Response in Opposition to each other's motion. (Lead Case Doc Nos. 27 (RCS); 28 (H.B.).)

For the reasons set out herein, RCS's motion will be granted and H.B.'s motion will be denied.

## I. LEGAL BACKGROUND

The parties' cross-filed motions and memoranda discuss discipline procedures under both the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Therefore, the court will first discuss the relevant legal framework and standard of review.

### A. The IDEA.

#### 1. A "Child with a Disability" under the IDEA.

Congress enacted the IDEA "(A) to ensure that all children with disabilities have available to them a free appropriate public education [('FAPE')] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; [and] (B) to ensure that the rights of children with disabilities and parents of such children are protected[.]" 20 U.S.C. § 1400(d)(1)(A)–(B). The IDEA's implementing regulations are codified in 34 C.F.R. Part 300.

To be considered a "child with a disability"[2] under the IDEA entitled to a FAPE, a child must have (1) "intellectual disabilities, hearing impairments (including deafness), speech or

---

[1] H.B.'s motion is styled as "Plaintiffs' Motion for Judgment Sustaining Relief in a Due Process Hearing." (Lead Case Doc. No. 21 at 1.)

[2] The court will use "child with a disability" and "student with a disability" interchangeably throughout this memorandum.

language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities"; and (2) must, "by reason thereof, need[] special education and related services." 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8.

School districts have an affirmative obligation under the IDEA, called "child find," to identify, locate, and evaluate children with disabilities that may need special education and related services, and to reach "[c]hildren who are suspected of being a child with a disability." 34 C.F.R. §§ 300.8, 300.111(c)(1); *see also Ja. B. v. Wilson Cnty. Bd. of Educ.*, 61 F.4th 494, 501 (6th Cir. 2023).

Decisions regarding whether a child is a "child with a disability" who is eligible for special education and related services are made by a "group of qualified professionals and the parent of the child" in an eligibility meeting after an evaluation of the child. 34 C.F.R. §§ 301–306.

In addition to the IDEA, the provision of a FAPE to Tennessee children with disabilities is governed by Tenn. Code Ann. § 49-10-101 *et seq.* and the Tennessee State Board of Education rules (specifically, Chapter 0520-01-09) promulgated under the statute. Tennessee has two additional state-identified disabilities–functional delay and intellectually gifted–that are not recognized as disabilities under the federal program but under which a student could qualify for special education and related services in this state. Tenn. Code Ann. § 49-10-102(1); Tenn. R. & Regs. 0520-01-09-.02(3).[3]

[3] Tenn. R. & Regs. 0520-01-09-.02(3) defines a "child with a disability" as a child "who has been evaluated and determined as having a state-identified disability of functional delay or intellectually gifted, or as having one (1) or more of the following disabilities as defined in 34 C.F.R. § 300.8 . . . ."

A child with an "intellectually gifted" disability is a child whose "intellectual abilities, creativity, and potential for achievement are so outstanding that the child's needs exceed differentiated general education programming, adversely affect educational performance, and require specifically designed instruction or support services." Tenn. R. & Regs. 0520-01-09-.03(8)(a).

### 2. The IDEA's discipline procedures and the manifestation determination review.

The IDEA confers certain protections on students with disabilities facing discipline for violation of their school district's code of student conduct. 34 C.F.R. §§ 300.530–537. Children identified as intellectually gifted do not receive those protections unless they have a "dual diagnosis" that includes their "intellectually gifted" disability. Tenn. R. & Regs. 0520-01-09-.03(8)(c).[4]

The main protection is the manifestation determination review ("MDR"). If a student with a disability violates the code of student conduct, and school administrators decide[5] to impose a disciplinary change of placement[6] for that violation that would exceed 10 consecutive school days (for example, a one-year expulsion), the school must conduct an MDR within 10 school days of

---

[4] "Children identified as Intellectually Gifted are exempted from the discipline procedures at 34 C.F.R. § 300.530-537. Children with a dual diagnosis that includes Intellectually Gifted must be considered as children with a disability and may not be exempted from the discipline procedures at 34 C.F.R. § 300.530-537." Tenn. R. & Regs. 0520-01-09-.03(8)(c).

[5] Question F-2 of the U.S. Department of Education's relevant guidance states that a "manifestation determination review must be conducted when school personnel *propose* to change the placement of a child with a disability because of a violation of the school's code of student conduct." U.S. Dep't of Educ., Office of Special Educ. Progs., OSEP Q&A 22-02, *Questions and Answers: Addressing the Needs of Children with Disabilities and IDEA's Discipline Provisions* (2022), https://sites.ed.gov/idea/idea-files/qa-addressing-the-needs-of-children-with-disabilities-and-idea-discipline-provisions/ (emphasis added) (hereinafter, "OSEP Q&A 22-02").

[6] A disciplinary "change of placement" occurs if "(1) the removal is for more than 10 consecutive school days…" 34 C.F.R. § 300.536(a)(1).

that decision. 34 C.F.R. §§ 300.530(c), (e). During an MDR, the school, parent, and relevant members of the student's Individualized Education Program ("IEP") team[7] "must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine (i) [i]f the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (ii) [i]f the conduct in question was the direct result of the [school district's] failure to implement the IEP." 34 C.F.R. § 300.530(e). If the answer to both questions is no, then "school personnel may apply the relevant disciplinary procedures to children with disabilities in the same manner and for the same duration as the procedures would be applied to children without disabilities. . . ." *Id.* at § 300.530(c). If the answer to either question is yes, then the student will return to school with additional supports (subject to certain exceptions.) *Id.* at § 300.530(f)(2).

**3. Discipline procedures for children who have not been determined eligible for special education and related services.**

Students who have not been determined to be eligible for special education and related services when they engage in the behavior that violates the school district's code of student conduct "may assert any of the protections provided for in [34 C.F.R. §§ 300.530–537]" if the school district is "deemed to have knowledge"[8] that the student has an IDEA-qualifying disability and is entitled to a FAPE. 20 U.S.C. 1415(k)(5); 34 C.F.R. § 300.534(a).

---

[7] Once a child is determined to be a "child with a disability," the IEP team, whose members are unique to each child, collectively makes decisions regarding special education and related services that the child needs to receive a FAPE. 34 C.F.R. §§ 300.320–321(a).

[8] There are specific conditions in 34 C.F.R. §§ 300.534(b), (c) that govern whether a school district is "deemed to have knowledge" that the student has a disability and is entitled to a FAPE. H.B. alleged in her due process complaint that RCS was "deemed to have knowledge" of her disability when her school proposed expelling her, but the parties do not contest that the due process hearing yielded facts establishing that RCS did not have knowledge of a disability. (*See* Lead Case Doc. No. 22 at 2.) Therefore, the court will not discuss those conditions in detail but will note that the school district's knowledge of the disability is determined based on certain events

However, if the school district is not "deemed to have knowledge," the following conditions apply:

> (1) If a public agency does not have knowledge that a child is a child with a disability (in accordance with paragraphs (b) and (c) of this section) *prior to taking disciplinary measures against the child*, the child may be subjected to the disciplinary measures applied to children without disabilities who engage in comparable behaviors consistent with paragraph (d)(2) of this section.
>
> (2) (i) If a request is made for an evaluation of a child during the time period in which the child is subjected to disciplinary measures under § 300.530, the evaluation must be conducted in an *expedited manner*.
> (ii) Until the evaluation is completed, the child remains in the educational placement determined by school authorities, which can include suspension or expulsion *without educational services*.
> (iii) If the child is determined to be a child with a disability, taking into consideration information from the evaluation conducted by the agency and information provided by the parents, *the agency must provide special education and related services in accordance with this part*, including the requirements of §§ 300.530 through 300.536 and section 612(a)(1)(A) of the Act.

34 C.F.R. § 300.534(d) (emphasis added). The court will make several observations regarding specific terms used in this section.

First, whether the school district is "deemed to have knowledge" is assessed "prior to taking disciplinary measures against the child," that is, before the school decides to impose a consequence for violating the code of conduct, such as suspension or expulsion. *Id.* at § 300.534(d)(1).

Second, the regulations do not establish a timeline for an "expedited" evaluation or the timeline for determining eligibility for a FAPE. *Id.* at § 300.534(d)(2)(i). A non-expedited, regular initial evaluation conducted prior to an eligibility determination must be conducted within 60 days of receiving parental consent for the evaluation. *Id.* at § 300.301(c)(1). During its rulemaking process, the U.S. Department of Education explicitly declined to set a deadline for an expedited

---

that take place "before the [student's] behavior that precipitated the disciplinary action." 34 C.F.R. §§ 300.534(a), (b).

evaluation conducted under (d)(2)(i), or even a corresponding eligibility determination, when it received a comment requesting a specific deadline for both. The Department merely stated that the expedited evaluation should be conducted in a shorter period than the deadline set out for a non-expedited, initial evaluation and that the eligibility decision should be made within "a reasonable period of time." 71 Fed. Reg. 46728 (Aug. 14, 2006).

Third, if the child is determined to be a child with a disability upon the results of the expedited evaluation, the school district must provide special education and related services and relevant discipline protections. Notably, the subsection does not state that the child "may assert any of the [disciplinary] protections provided for in [34 C.F.R. §§ 300.530–537]" in these scenarios, unlike when the school district is "deemed to have knowledge" of the disability when the child violates the code of student conduct.

**B. Section 504 and its Discipline Procedures.**

Section 504 prohibits discrimination against individuals with disabilities more broadly. *Knox Cnty. v. M.Q. ex rel. N.Q.*, 62 F.4th 978, 999 (6th Cir. 2023). It provides that:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). Section 504's implementing regulations require that students with disabilities have equal access to public schools. 34 C.F.R. § 104.33. "Section 504 further requires states to assure 'meaningful access' to their programs by making reasonable accommodations as may be necessary." *M.Q.*, 62 F.4th at 999 (quoting *Doe ex rel. K.M. v. Knox Cnty. Bd. of Educ.*, 56 F.4th 1076, 1088 (6th Cir. 2023)).

Section 504's reach is broader than the IDEA's: it applies to all students who have mental or physical impairments, who have a record of physical or mental impairments, or who are

regarded as having mental or physical impairments, if the impairments substantially limit one or more major life activities. 34 C.F.R. § 104.3(j).[9] It also imposes a similar child-find obligation to identify, locate, and evaluate children with disabilities who need or are believed to need special education or related services. *Id.* at §§ 104.32, 104.35.

Section 504 similarly requires school districts to conduct an "evaluation," which is functionally a manifestation determination review, of "any person who, because of handicap . . . is believed to need special education or related services before taking any action with respect to . . . any subsequent significant change in placement." *Id.* at § 104.35(a). The court will refer to Section 504's requirement for an "evaluation" in these circumstances hereinafter as a "Section 504 MDR" to avoid confusion because an "evaluation" under the IDEA refers to a separate event in the process of determining a student's eligibility for special education and related services.

**C. Judicial review of administrative decisions under the IDEA.**

Parents of children with disabilities can request an expedited due process hearing by filing a complaint if they disagree with any decision regarding their child's disciplinary change of placement. *Id.* at. § 300.532. Administrative judges ("ALJs") within the Tennessee Department of State's Administrative Procedures Division preside over such hearings. Tenn. Code Ann. § 49-10-606(a). A party "aggrieved by the [ALJ's] findings and decisions" after an expedited due process hearing can file suit in a United States district court. 34 C.F.R. § 300.516(a). The district court reviewing the ALJ's determination "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the

---

[9] The definition of "mental impairment" includes emotional or mental illness. 34 C.F.R. § 104.3(j)(2)(i)(B). "Major life activities" is defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at (j)(2)(ii).

preponderance of the evidence, shall grant such relief as the court determines is appropriate.[10]" 20 U.S.C. §§ 1415(i)(2)(C)(i)–(iii); 34 C.F.R. § 300.516(c).

The district court applies a "modified *de novo*" standard that requires the court "to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *G.E. v. Williamson Cnty. Bd. of Educ.*, 731 F. Supp. 3d 954, 965 (M.D. Tenn. 2024) (citing *Somberg on behalf of Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 172 (6th Cir. 2018)), *aff'd*, No. 24-5969, 2026 WL 384250 (6th Cir. Feb. 11, 2026).

The amount of weight due to the ALJ's findings depends on "whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings." *Burilovich ex rel. Burilovich v. Bd. of Educ.*, 208 F.3d 560, 566 (6th Cir. 2000). When reviewing procedural issues, "a court should 'strictly review' " whether the school complied with the IDEA's procedural requirements. *Id.* (quoting *Dong ex rel. Dong v. Bd. of Educ.*, 197 F.3d 793, 800 (6th Cir. 1999)). When reviewing substantive issues, courts "must keep in mind that the state and local educational agencies are deemed to possess expertise in education policy and practice." *Burilovich*, 208 F.3d at 567. "As a result, less weight is due to an agency's determinations on matters for which educational expertise is not relevant, so that a federal court would be just as well suited to evaluate the situation[,]" while "[m]ore weight is due to an agency's determinations on matters for which educational expertise would be relevant." *Id.*

---

[10] "Appropriate" relief has a broad meaning, and the court considers the IDEA's relevant purpose when fashioning discretionary equitable relief. *Bristol Twp. Sch. Dist. v. Z.B.*, No. 15-4604, 2016 WL 161600, at *13 (E.D. Pa. Jan. 14, 2016) (internal citations omitted).

## II. FACTUAL BACKGROUND

The facts established at the due process hearing are materially undisputed, and neither of the parties asks the court to receive additional evidence. Therefore, this court will take most of the ALJ's factual findings laid out in the November 20, 2025 Amended Final Order as undisputed and draw from the hearing transcript and its exhibits as needed. (Technical Record[11] at 245–801; 933–51). The court will also incorporate facts that are undisputed in the parties' pleadings. (Lead Case Doc. Nos. 1, 11; Member Case Doc. Nos. 1, 2.)

### A. H.B.'s Centerstone therapy sessions at WBMS.

H.B. was an 8th-grade student at Whiteworth-Buchanan Middle School ("WBMS") in Rutherford County during the 2024–2025 school year, when the events alleged in the due process hearing complaint occurred. During her 8th grade year, she had an IEP for the disability of "intellectual giftedness," which was updated on November 11, 2024 during an annual IEP meeting and was set to expire on November 11, 2025.

Centerstone is a community organization that is generally outside of school but will sometimes come into schools and provide certain types of mental health therapy to students. Under a Memorandum of Understanding between Centerstone and RCS, RCS outsources mental health therapy for its students to Centerstone, with RCS providing the counseling space and developing a "referral system," and Centerstone communicating weekly with RCS to improve the coordination of services. Centerstone therapy is available to all students within the school, regardless of disability. Appointments are arranged by the students' parents.

---

[11] The administrative record is contained in Lead Case Doc. Nos. 17, 17-1, 17-2, 17-3, and it is hereinafter referred to as "T.R." Citations to the T.R. will follow the Tennessee Department of Education's page numbers, not the CM/ECF PageID numbers.

H.B. first started receiving therapy services from Centerstone towards the end of her sixth-grade year. Jessica Mitchell was the Centerstone therapist who came into WBMS to conduct therapy sessions. H.B.'s therapy sessions with Ms. Mitchell during her eighth-grade year took place as pull-outs from H.B.'s honors algebra class, which met five times per week. Michelle Willatt was H.B.'s honors algebra teacher that school year. The therapy sessions initially occurred two or three times a month but became weekly after March 15, 2025. By H.B.'s eighth-grade year, WBMS's assistant principal, Rebecca Cousin, knew that H.B. received mental health therapy sessions with Ms. Mitchell. However, the frequency or purpose of the sessions was not shared with Ms. Cousin.

**B. D.B.'s communications with Michelle Willat, H.B.'s honors algebra teacher, and related events in October 2024.**

H.B.'s mother, S.B., first observed evidence of self-harm on H.B. in May or June of 2024, towards the end of H.B.'s seventh-grade year, when S.B. saw some healed scars on H.B.'s arm while they were at a waterpark.

On October 3, 2024, H.B.'s father, D.B., informed Ms. Willatt that H.B. had started a new medication at the first of the school year in consultation with H.B.'s pediatrician and therapist. While the regimen had been working well, H.B. became stressed and relapsed to her self-harming behavior during class with Ms. Willatt. D.B. asked Ms. Willatt, "[p]lease keep this information private between just you, myself, and [S.B.]." (T.R. at 706.) He added on October 4, 2024 that H.B. "slips into depression" and had experienced cutting issues over the summer. (*Id.* at 703.) Ms. Willatt told D.B. that she had no idea that H.B. was self-harming and that H.B. was volunteering frequently and seemed confident in her understanding in class. During the hearing, H.B. stated that October 3, 2024 was the only time she engaged in self-harm at school during her eighth-grade year and that Ms. Willatt was the only teacher to whom she mentioned this.

Ms. Willatt felt overwhelmed after reading D.B.'s emails, so she approached Kimberly Malcolm, the Section 504 coordinator, and Marcus Lyons, a guidance counselor. Ms. Willatt felt she needed help. She did not immediately share H.B.'s name until Mr. Lyons followed her back towards her classroom and asked for the names so he could notify WBMS administrators. Mr. Lyons then sent Ms. Willatt an email with a mental health resource sheet for the parents and asked her to remind the parents to keep H.B. away from sharps, stay vigilant, and not leave her alone. He copied Ms. Cousin, Ms. Malcom, and WBMS principal April Sneed on the email. Mr. Lyons sent another email to Ms. Sneed and Ms. Cousin and added, "[D.B. and S.B.] said they are getting help for [H.B.], did not want Ms. Willatt to tell anyone about it." (*Id.* at 726.)

Mr. Lyons had little personal contact with H.B. He recalled once discussing with H.B. her concern about how her parents might react to her performance on a particular assignment. H.B. shared no mental health status information with Mr. Lyons. Other than the interaction with Ms. Willatt, no teacher reported to Mr. Lyons that H.B. was having behavioral, academic performance, or attendance issues.

**C. H.B.'s annual IEP meeting on November 11, 2024.**

On November 12, 2024, H.B.'s annual IEP meeting was held, and the team drafted an IEP that would be effective from November 12, 2024 to November 11, 2025. Ms. Cousin attended the meeting as the school's representative. Susan Townsend attended the meeting as the gifted facilitator for WBMS. S.B. shared with the IEP team that H.B. was taking antidepressants, so that information could be included in the IEP along with information that H.B. had been treated for bladder issues and supraventricular tachycardia. S.B. did not share with the IEP team any information about H.B.'s engaging in self-harm or any other mental health concerns. S.B. did not request any services, accommodations, or assessments. The IEP developed by the team states, in

the Current Information and Special Factors section, that H.B. does not exhibit patterns of behavior that hinder her or others' learning or place her or others at risk. It only lists special education services to be provided for giftedness and identifies no accommodations. (*Id.* at 728–735.)

Ms. Townsend reviewed a "prevocational checklist" before the IEP meeting as a method of assessing whether there were other areas of eligibility or services that might be needed for H.B. The checklist is completed by teachers and includes 29 traits of giftedness. Those traits include socialization, motivation, the ability to work with others, and other social/emotional learning skills. All of H.B.'s scores for her age and grade level were at or above average. No category indicated a need for improvement.

**D. Drama club incident in February or March of 2025.**

H.B. participated in the school drama club as an extracurricular activity. Stephanie Dye was a seventh-grade science teacher and the sponsor of the drama club. Ms. Dye was H.B.'s science teacher and was aware that H.B. attended counseling sessions because H.B. was sometimes pulled out of the science class in the seventh grade.

On October 23, 2024, Ms. Dye reached out by text to S.B. to set up a private meeting. Ms. Dye had seen shallow, uniform scratches on H.B.'s forearm that Ms. Dye recognized as evidence of self-harm from Ms. Dye's personal experience with her own daughter. Ms. Dye met with S.B., who confirmed that she was aware of the specific incident that resulted in the scratches and that the parents were already seeking help for H.B. in that regard. Ms. Dye did not report her observations to anyone else at school, including the administrators or the Section 504 coordinator.

In February or March 2025, H.B. and a male student who was also part of the drama club got into an argument that involved pushing or other physical contact. The argument happened because the other student was flirting with one of H.B.'s friends, and H.B. believed she needed to

intervene on her friend's behalf. Ms. Dye investigated the situation by talking to both students and witnesses. She determined that both students were at fault and accordingly removed them from the drama club for the rest of the school year. Ms. Dye informed the parents of both students. Afterward, Ms. Dye also informed Ms. Cousin.

Ms. Cousin had a follow-up meeting with parents shortly afterwards, in February or March. Ms. Cousin heard from H.B. her account of what had happened. H.B. confirmed what Ms. Dye had reported. Ms. Cousin then spoke privately with S.B. Ms. Cousin recalled that S.B. was tearful because H.B. would miss participating in the activity that she had enjoyed.

During the hearing, S.B. recalled expressing concern during this meeting that not being in the drama club would negatively affect H.B.'s mental health because she enjoyed that aspect of school. S.B. recalled stating that H.B. did not enjoy coming to school because students bullied her. She gave examples that students who were aware of her scars would say to H.B., if she wore short sleeves, that she should go home and finish the job and that, if she wore long sleeves, they would say H.B. was embarrassed or ashamed. S.B. did not provide the names of specific students. S.B. wanted Ms. Cousin to allow H.B. to return to the drama club. S.B. did not request any evaluation of any mental health issues or request any other accommodation.

Ms. Cousin recalled discussing with the parents during this meeting what H.B. perceived as bullying. (*Id.* at 410–412.) The parents mentioned that there were students who made fun of the way H.B. dressed and her appearance in general. (*Id.* at 411.) Ms. Cousin stated that she had requested but did not receive the names of specific students, which she needed to further investigate and take any intervening action if needed. (*Id.*) No one mentioned to Ms. Cousin anything about H.B.'s self-harming behavior or any mental health issues. (*Id.* at 410–11, 413–14.)

### E. H.B. placed on suicide watch on March 15, 2025.

On March 15, 2025, H.B. contacted a suicide crisis hotline. As a result, first responders came to H.B.'s home address, waking up D.B. and S.B. at 1:00 a.m. to conduct a welfare check. H.B was transported to an emergency room, where she was examined and released after interviews with appropriate providers. The interventionists, along with H.B.'s pediatrician and therapist (Ms. Mitchell), worked with D.B. and S.B. to develop a safety plan for H.B. Neither the incident nor the safety plan was shared with anyone at WBMS.

Coincidentally, Ms. Willatt emailed H.B. on March 15, 2025, at 8:53 p.m., to remind her to turn in a flip book, a blue syllabus, and some homework assignments. D.B. returned Ms. Willat's email on March 20, 2025, thanking her for caring enough to remind H.B. about the missing schoolwork and inquiring whether H.B. had turned in the assignments. D.B. included in the email that he doubted H.B. had shared that the previous weekend had been a tough one and that H.B. had been placed on suicide watch. D.B. requested that Ms. Willatt keep the information "please just between us and not mentioning to [H.B.] unless she brings it up[.]" (*Id.* at 715.)

D.B. sent another email on March 24, 2025, in response to Ms. Hannah Garrard, H.B.'s social studies teacher, who was concerned about H.B. performing below expectations on tests. D.B. copied Ms. Willatt on the reply. He disclosed that H.B. was experiencing daily bullying and that he had arranged for H.B. not to ride the school bus anymore. D.B. also mentioned that a relapse led to contact with the suicide hotline and an encounter with first responders on March 15, 2025. He asked her, "please keep this between just the two of us." (*Id.* at 717.) He emphasized that it was crucial for this information to remain confidential among Ms. Garrard, Ms. Willatt, and S.B., whom he referred to as his trust circle. (*Id.*) Ms. Willatt did not report information in this e-mail to the school administrators or anyone in the RCS special education department. (*Id.* at 300.)

Ms. Cousin did not learn of the March 15, 2025 incident and did not see the safety plan that was implemented for H.B. until sometime after April 9, 2025, and none of H.B.'s teachers or other school personnel reported to her that H.B. needed academic interventions or any other supports. (*Id.* at 415–18.)

### F. H.B.'s texts to Ms. Mitchell on April 4, 2025, the expulsion, and threat assessment.

On Friday, April 4, 2025, H.B. sent a text message to Ms. Mitchell, asking whether it was "normal to want to kill people." (*Id.* at 762.) On Monday evening, April 7, 2025, following that day's therapy session, H.B. sent another text message to Ms. Mitchell. This time, H.B. said "it's really bothering me" and "I'll snap." H.B. also said that she was "pissed you [Ms. Mitchell] keep caring about me," and articulated threats, including: "I'm going to end up hurting you emotionally and physically in the end." (*Id.* at 763.)

On April 9, 2025, early in the morning, Ms. Mitchell shared the content of the text messages with Ms. Cousin, permitting Ms. Cousin to take a picture of the text messages that were displayed on Ms. Mitchell's phone. Ms. Mitchell indicated that she was unsure what to do with that information. Ms. Cousin said that she would speak to Ms. Sneed and that there was nothing else for Ms. Mitchell to do. Ms. Mitchell did not volunteer her thoughts that things with H.B. had been accelerating since the incident that resulted in H.B. being removed from the drama club the previous month. Ms. Cousin did not request any additional information or insight into possible triggers for the text messages.

Ms. Cousin went to Ms. Sneed, and they decided to conduct a safety check. (*Id.* at 376.) Ms. Cousin searched H.B.'s bookbag and found a fettling knife,[12] which is used in pottery. (*Id.* at

---

[12] The ALJ stated in the Amended Final Order dated November 20, 2025 that "the size and shape of the blade are such that it could be perceived to be a dangerous weapon if used for the purpose of inflicting injury." (*Id.* at 1045.)

376–80.) Ms. Cousin and Ms. Sneed reviewed the RCS's Zero Tolerance Offenses policy and determined that H.B. was to be expelled for one calendar year under the "Reasoned Judgment Offense" of the Rutherford County Board of Education Policy No. 6.309 (*Id.* at 380, 384.) That policy provides that certain offenses, "depending on the individual circumstances, may warrant a reasoned judgment by the Principal in assigning discipline. These offenses may result in suspension, remandment, or expulsion up to one (1) year." (*Id.* at 744–45.) Ms. Cousin entered the expulsion determination in the computer system and notified the parents of the expulsion on April 9, 2025. (*Id.* at 394–96, 436, 747, 761.)

On April 11, RCS conducted a threat assessment using the Comprehensive School Threat Assessment Guidelines. (*Id.* at 398–99.) The purpose of the threat assessment was to decide whether extra supports or safety precautions are needed when a student returns to school. (*Id.* at 427–28, 644–45.) A multi-disciplinary team consisting of Ms. Cousin, a school psychologist, social workers, a teacher, the parents, and H.B. concluded her threat was "transient," a low-level threat. (*Id.* at 398–99.)

H.B. stated during the hearing that she had become upset that Ms. Mitchell, as the therapist, began crying in a session. H.B. stated that she sent the text messages when she experienced a brief outburst of anger. H.B. also stated that she never had a plan to harm Ms. Mitchell and particularly never intended to use the fettling knife for anything other than pottery.[13]

---

[13] H.B. stated during the hearing that pottery is her hobby and the fettling knife is included in her pottery kit. (T.R. at 451–453.) She sometimes worked on her pottery to pass the time after she finished her assignments early in class. (*Id.* at 453.)

## III. PROCEDURAL BACKGROUND

### A. The pre-hearing proceedings and the due process hearing.

H.B. and her parents, through counsel, filed a due process complaint against RCS on September 11, 2025. (*Id.* at 1–10.) The complaint alleged that RCS "did have a basis for knowledge of H.B.'s giftedness along with her mental disability" of anxiety and depression and asserts that H.B. "was entitled to the procedural protections of both the IDEA and Section 504, which includes a manifestation determination and/or evaluation prior to removal for more than ten days."[14] (*Id.* at 7.)

On October 14, 2025, the ALJ ordered RCS to "conduct an expedited mental health assessment of H.B." to determine whether she "has any mental health exceptionality, such as emotional disturbance, that requires special education services." (*Id.* at 205.)

After lengthy pre-hearing proceedings involving production of educational and mental health records and H.B.'s temporary placement during the proceedings, the due process hearing took place on October 15 and 24, 2025. The ALJ entered a Final Order on November 10, 2025, upholding the expulsion because RCS was not "deemed to have knowledge" of H.B.'s disability. (*Id.* at 950.) The Order further stated:

> However, if the assessment ordered on October 14, 2025, indicates that H.B. has a disability and that her conduct was related to that disability, the school must immediately end the expulsion and re-enroll H.B. in the appropriate general education class, providing the necessary services and supports as determined by the IEP Team. While awaiting the

---

[14] It is unclear if H.B.'s due process complaint, on its face, requests an expedited evaluation under 34 C.F.R. § 300.534(d)(2), or a Section 504 MDR. Under 34 C.F.R. § 300.511(d), H.B. "may not raise issues at the due process hearing that were not raised in the due process complaint" unless RCS agrees otherwise. The ALJ determined that H.B. requested an expedited evaluation in her complaint. (T.R. at 951.) H.B. did explicitly request an expedited evaluation in her pre-hearing brief. (*Id.* at 167–68.)

Because RCS conducted an expedited evaluation and convened an eligibility meeting, the court will not discuss whether H.B. properly asserted her right to an expedited evaluation in her complaint and whether the expedited evaluation was timely.

> evaluation results, H.B. shall remain in the educational placement determined by school authorities. The assessment should have been expedited beginning September 11, 2025. Depending on the evaluation's outcome, the Petitioners may be the prevailing parties on issues of compensatory education, reimbursement for educational costs, and other related remedies. 20 U.S.C.A. § 1415 (k)(5)(D)(ii).

(*Id.* at 951.)

H.B. filed a Petition for Reconsideration of Section 504 Claim, requesting a more detailed ruling on her claim that RCS had "reasonable suspicion" of H.B.'s disability under Section 504 and should have conducted a Section 504 MDR. (*Id.* at 954–958.) The Petition conceded that whether the school district is deemed to have knowledge of a student's disability under the IDEA is measured when the student engages in behavior that violates the code of student conduct, but it then manufactured a new ten-day time period dating from the beginning of the expulsion during which RCS incurred, according to H.B., a newfound duty to conduct a Section 504 MDR. (*See id.* at 955 ("Under Section 504, a disciplinary removal cannot occur until the school conducts a Section 504 evaluation and the team determines whether the behavior was related to the disability. Discrimination begins after day 10.").)

RCS also filed a Petition for Reconsideration and argued that, even if the "expedited mental health assessment of H.B." ordered on October 14 indicates that she has a disability, she is not entitled to a "post-hoc manifestation determination for the conduct that led to her April 9, 2025 expulsion" or an automatic end to the expulsion and return to her general education class. (*Id.* at 966–87.) On November 19, the ALJ denied both petitions but stated that he would amend his Final Order for clarification. (*Id.*at 1029–34.)

On November 20, the ALJ entered an Amended Final Order. (*Id.* at 1035–55.) The issues for determination at the due process hearing were listed as follows:

1. Under the IDEA, did RCS have a "basis of knowledge" under 34 C.F.R. §300.534(b) that H.B. was a child with a disability, thus requiring RCS to conduct a manifestation determination before expelling H.B.?

2. Under Section 504, did RCS have a "reason to suspect" that H.B. was a child with a disability, thus requiring RCS to conduct a manifestation determination before expelling H.B.?

(*Id.* at 1036–37.) The ALJ found that RCS was the prevailing party on both issues because H.B. was not a "child with a disability" under the IDEA or Section 504 who is entitled to disciplinary protections. (*Id.* at 1035–55.) RCS was deemed not to have knowledge under 34 C.F.R. § 300.534 that H.B. had a disability. The Order stated,

> [t]he record does not show that H.B.'s behavior on April 9, 2025, was a sign of her known disability or a disability that the [RCS] was aware of before the disciplinary action but did not include in H.B.'s IEP. The record also does not prove that H.B. should have been treated as a student with a disability that was not yet officially recognized.

(*Id.* at 1053.) The ALJ also found that, while H.B. had a mental health diagnosis, she was not entitled to disciplinary protections because "[t]here was no evidence of interference with H.B.'s access to education or any substantial limitation in major life activities…like learning, concentrating, and functioning at school." (*Id.* at 1053–54.)

The Order then continued, similarly as above,

> It is anticipated that such evidence would be derived as a result of the two evaluations ordered on October 1, 2025, and October 14, 2025. Without the information that includes appropriate professionals interpreting the mental health diagnosis against the various definitions of disability, it could not be determined under the IDEA or Section 504 that H.B. was a child with a disability, which is the first step in the analysis of whether H.B. was deprived of supports, services, and protections that may be available under either statutory construct.
>
> In summary, a diagnosis of anxiety is a potential indicator but not an automatic qualification for a Section 504 disability; substantiated educational impact and evaluation are required for a determination.
>
> …
>
> Furthermore, the evaluation ordered on October 14, 2025, shall be conducted in a manner that considers disability under both IDEA and Section 504 criteria. *If the assessment ordered on October 14, 2025, indicates that H.B. has a disability and that her conduct was related to that disability, the school must immediately end the expulsion and re-enroll H.B. in the appropriate general education class, providing the necessary services and supports as determined by the IEP Team.* While awaiting the evaluation results, H.B. shall remain in the educational placement

> determined by school authorities. The assessment should have been expedited beginning September 11, 2025. Depending on the outcome of the evaluation, the Petitioners may be the prevailing parties on issues of compensatory education, reimbursement for educational costs, and other related remedies. 20 U.S.C.A. § 1415 (k)(5) (D)(ii).

(*Id.* at 1054–55 (emphasis added).)

H.B. again filed a Petition for Reconsideration of Section 504 Claim, objecting to the ALJ's determination that her Section 504 claim "relied on the 'same information, the same conduct, and the observations available to RCS over the same period of time[.]'" (*Id.* at 1102.) She then continued a convoluted argument that was initially raised in her previous Petition for Reconsideration: that her "504 reasonable suspicion claim" is "*like* child find" and that, even if RCS had no pre-expulsion knowledge of her disability, RCS should have realized after her actions that led to the expulsion and the subsequent threat assessment that she, "because of handicap[,] . . . is believed to need special education or related services" under Section 504. (*Id.* at 1102–1123.) According to H.B., RCS's duty to conduct a Section 504 MDR arose after her actions and threat assessment, and it was ongoing until the tenth day of the one-year expulsion. (*Id.*) On December 11, 2025, the ALJ denied the Petition, finding that the information RCS received during the threat assessment was insufficient to establish that it had "reason to suspect" that H.B. had a disability under Section 504. (*Id.* at 1183–86.)

**B. The expedited evaluation, eligibility meeting, and MDR.**

On December 15, 2025, RCS convened a Section 504 meeting to review the results of the expedited evaluation ordered on October 14 to determine H.B.'s eligibility for a Section 504 plan. (*Id.* at 1229–36.) The team found that she has an impairment that affects major life activities of concentrating, thinking, communicating, and bodily functions but decided that she does not need any accommodations in school. (*Id.*) On December 18, 2025, H.B.'s IEP team also reviewed the

results of the expedited evaluation and determined that she is eligible to receive special education and related services for the IDEA-qualifying disability of emotional disturbance but decided not to include any specific services or accommodations in her IEP because before she was expelled, she had attended school successfully without any academic or behavioral issues, and her needs would be re-assessed after she returns to school. (*Id.* at 1198–1203, 1229–36.) On January 6, 2026, the second day of the spring semester, the IEP team held an MDR for H.B.'s actions that led to her expulsion, this time in possession of the new information obtained from the expedited evaluation and recent meetings. (*Id.* at 1198–1203, 1218–23.) The team found that her actions were a manifestation of her disability of emotional disturbance, generalized anxiety disorder, and "major depressive episode." (*Id.*) H.B. returned to her zoned RCS high school with a safety plan the next day, January 7, 2026. (*Id.* at 1225–27.)

On January 8, 2026, H.B. filed a Motion to Record H.B.'s Change of Status and Obtain Remedy based on her new IDEA-qualifying disability and subsequent MDR results. (*Id.* at 1211–42.) On January 20, 2026, the ALJ granted H.B.'s Motion and recognized her as the prevailing party based on the results of the expedited evaluation, eligibility meeting, and MDR. (*Id.* at 1243–46.) The ALJ also awarded H.B. several hundred dollars in interim education expenses, the right to sit for a missed algebra exam, and compensatory education. (*Id.*)

**C. Federal court proceedings.**

On the same day, H.B. and her parents filed a Complaint and initiated the Lead Case, asserting that they are entitled to costs and attorneys' fees based on their prevailing party status and requesting a finding that RCS possessed reasonable suspicion of H.B.'s disability under Section 504 by April 11, 2025. (Lead Case Compl., Doc. No. 1.) That same day, RCS also filed a Complaint (Member Case Compl., Doc. No. 1) along with Exhibits (Member Case Doc. Nos. 1-1

through 1-14.) That Complaint seeks reversal of some of the ALJ's legal conclusions in the Amended Final Order, including: (a) that the school must re-enroll H.B. if it turns out that her conduct was the result of a disability (Member Case Compl. at ¶¶ 182, 227, 229); (b) that H.B. was entitled to a manifestation determination review (*id.* at ¶¶ 186, 228) and the expedited evaluation (*id.* at ¶¶ 189, 230–31); and (c) that, depending on the evaluation's outcome, H.B. and her parents "may be the prevailing parties." (*id.* at ¶ 230; *see also id.* at ¶¶ 188, 232–35). RCS asks the court to: "(A) [r]everse or vacate the Order dated January 20, 2026 and only those portions of the [November 2025] Final Order that are challenged in this action; (B) [d]eny all relief awarded to Defendants in the underlying administrative due process proceeding; (C) [d]eclare RCS the prevailing party with respect to all claims asserted in the Due Process Complaint and all matters addressed in the [November 2025] Final Order; [and] (D) [a]ward RCS its reasonable attorneys' fees and costs, to the extent permitted by the [IDEA]." (*Id.* at 45.)

On June 26, 2026, the parties cross-filed Motions for Judgment on the Administrative Record, with accompanying memoranda. (Lead Case Doc. Nos. 19–20 (RCS), 21–22 (H.B.).) H.B. asked the court to affirm the ALJ's January 20, 2026 Order finding H.B. the prevailing party, dismiss as moot portions of RCS's Complaint relating to the expedited evaluation, MDR, and the termination of H.B.'s expulsion, or, in the alternative, "enter judgment that RCS had reasonable suspicion of H.B.'s disability under Section 504 no later than April 11, 2025, warranting an evaluation and manifestation determination review," and reserve time for separate submission of attorneys' fees motions. (Lead Case Doc. No. 21 at 2–3.) RCS asked the court to "reverse those portions of the Final Order and the January 20, 2026 Order requiring or implying a post-hoc manifestation determination review, concluding that RCS failed to timely evaluate H.B., awarding

relief based upon post-hearing events, and conferring prevailing party status upon Plaintiffs . . . [and] declare RCS the prevailing party in this action." (Lead Case Doc. No. 19 at 2.)

## IV. ANALYSIS

The major issues for determination at the due process hearing were: (a) whether RCS had either a basis of knowledge under 34 C.F.R. § 300.534(b) that H.B. had a disability or a "reason to suspect" that H.B. had an impairment under Section 504, and (b) whether she was entitled, as a result, to an MDR. The ALJ determined that RCS did not have a basis of knowledge of a disability or reason to suspect an impairment under either statute. The parties do not contest the determination that RCS did not have a basis of knowledge of H.B.'s disability under the IDEA. (*See* Lead Case Doc. No. 22 at 2.)

Therefore, the court will not revisit that determination and will instead focus on the two issues that are dispositive of both parties' Motions for Judgment on the Administrative Record: (a) whether the ALJ should have ordered an MDR for H.B.'s actions that led to her expulsion on April 9, 2025 based on the expedited evaluation conducted under 34 C.F.R. § 300.534(d)(2), and awarded her prevailing party status upon the results; and (b) whether the ALJ should have considered the events that occurred on and after the expulsion on April 9, 2025 to determine that RCS had a "reason to suspect" H.B.'s impairment and should have conducted a Section 504 MDR after she was expelled.

The court finds by a preponderance of the evidence that (a) the ALJ erred in ordering this MDR and awarding prevailing party status to H.B., and (b) RCS was not required to conduct a Section 504 MDR because only pre-expulsion events should have been considered in determining RCS's obligations to provide a Section 504 MDR in this case.

### A. The court has jurisdiction over the dispute regarding prevailing party status in the underlying administrative action and attendant legal consequences of that status.

First, the court briefly addresses H.B.'s Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction (Member Case Doc. No. 9), which the court previously denied without prejudice in the interest of judicial economy. (Lead Case Doc. No. 25.)

After the expedited evaluation was completed, RCS (albeit under protest) convened a Section 504 and IDEA eligibility meeting, conducted a manifestation determination review, ended H.B.'s expulsion, and returned her to school with a safety plan. H.B. is now back at her general education school and receiving special education and related services and accommodations that her IEP team determined that she needs. Therefore, disputes regarding the termination of H.B.'s expulsion and return to school are moot, since receiving the requested relief generally moots a claim. *In re Settlement Facility Dow Corning Tr.*, 760 F. App'x 406, 411 (6th Cir. 2019) (citing *Thomas Sysco Food Servs. v. Martin*, 983 F.2d 60, 62 (6th Cir. 1993)).

However, the court still has subject-matter jurisdiction over H.B.'s and RCS's competing claims that they are the prevailing party under the IDEA because federal district courts have sole authority to award reasonable attorneys' fees to the prevailing party. 34 C.F.R. § 300.517; *see also James T. ex rel. A.T. v. Troy Sch. Dist.*, 407 F. Supp. 2d 827, 829 (E.D. Mich. 2005) (ruling on whether the plaintiffs were "prevailing parties" and their entitlement to attorneys' fees under the IDEA).

### B. RCS is the prevailing party in the due process hearing because the ALJ erred in ordering that an MDR be conducted and that H.B. potentially be returned to her general education class based on the results of the expedited evaluation.

The ALJ erred when he ordered that "the school must immediately end [H.B.'s] expulsion and re-enroll [her] in the appropriate general education class" if the expedited evaluation conducted under 34 C.F.R. § 300.534(d) "indicates that H.B. has a disability and that her conduct

was related to that disability." (T.R. at 1054–1055.) He also erred when he granted H.B.'s Motion to Record Change of Status and Obtain Remedy. (*Id.* at 1243–1246.)

The court looks to the plain language of 34 C.F.R. § 300.534, "Protections for children not determined eligible for special education and related services," to reach that conclusion. As discussed above in the Legal Background section, 34 C.F.R. § 300.534 is divided into two parts. The first part, encompassed in subparts (a)–(c), governs cases when the school district is deemed to have knowledge of the student's disability at the time a student engages in behavior that violates the code of student conduct. Subsection (d), the second part, pertains to when the school district is deemed not to have such knowledge. When a district is deemed to have knowledge, a student who is disciplined "may assert any of the [IDEA's disciplinary protections]." 34 C.F.R. § 300.534(a). But when the district is deemed not to have knowledge, a student who is disciplined can request an expedited evaluation, and if the child becomes entitled to a FAPE upon the expedited evaluation and subsequent eligibility meeting, the school district "must provide special education and related services . . . including the [IDEA's disciplinary protections]." *Id.* at § 300.534(d)(2)(iii).

The court finds the difference in language, especially the absence of the term "assert" in subsection (d), to be intentional and significant. As a matter of statutory interpretation, the expression of one thing is the exclusion of another. *HRT Enters. v. City of Detroit*, 162 F.4th 810, 817 (6th Cir. 2025) (citations omitted). Further, the court will avoid any reading of the statute that "would render words superfluous." *LaFleur v. Yardi Sys., Inc.,* 168 F.4th 410, 415 (6th Cir. 2026). If the district does not have knowledge, then the child receives some, but less, protection than when the district does. The child does not get to assert the IDEA's disciplinary protections for the discipline at hand but does become entitled to a FAPE and the IDEA's disciplinary protections, if necessary to assert, moving forward.

This interpretation is consistent with other provisions of the IDEA. For IDEA protections to apply, not only must the child have a disability, but the school district must also have knowledge of that disability. It is for this reason that the IDEA imposes a child-find requirement on school districts to identify, locate, and evaluate students with disabilities and that the statute sets out specific situations in which knowledge of the student's disability is imputed to the district. Without such knowledge, a district can treat the child as one without a disability. 34 C.F.R. § 300.534(d)(1) ("If a public agency does not have knowledge that a child is a child with a disability . . . prior to taking disciplinary measures against the child, the child may be subjected to the disciplinary measures applied to children without disabilities who engage in comparable behaviors."); *accord D.S. v. Blue Ridge Sch. Dist.*, No. 3:24-cv-00184, 2025 WL 976700, at *5 (M.D. Pa. Mar. 31, 2025) ("[S]chools must have knowledge of a disability for a student to invoke the IDEA's protections and procedures. Therefore, in this case, the District must have had knowledge that the Student was 'a child with a disability' at the time of the suspension for the Student to invoke the requirement of 300.530(e). . . .[H]owever, the District did not have knowledge . . . [and] a manifestation determination was not required.").

The timing and effect of the MDR ordered by the ALJ after H.B.'s expedited evaluation also suggests that he erred in ordering one under subsection (d).

First, the timing. The IDEA strictly requires that MDRs be conducted within 10 school days of the school's decision to implement a disciplinary change of placement. The U.S. Department of Education in *Letter to Nathan*, 73 IDELR 240 (OSEP Jan. 29, 2019) responded to questions regarding MDRs conducted when a school district was deemed to have knowledge of the student's disability. The Department stated that an MDR in this case cannot be postponed until after an evaluation and eligibility meeting, because the IDEA does not allow for a postponed MDR

and strictly requires it to be conducted within 10 school days of deciding a disciplinary change of placement. *Letter to Nathan*, 73 IDELR at 240. A timely MDR conducted in this scenario "would likely consider the information that served as the [school district's] basis of knowledge that the child may be a child with a disability under IDEA, such as concerns expressed by a parent, a teacher or other [school district] personnel about a pattern of behavior demonstrated by the child" because the team may not have full knowledge of the disability and an IEP may not be in place. *Id.* If we assume that an MDR is required under subsection (d), when the school is deemed not to have knowledge, it either could not reasonably take place within 10 school days and, therefore, would be untimely, or, if it took place within 10 days, the team would possess little to no information necessary to perform an MDR.[15]

Second, the effect. The MDR that the ALJ ordered had a perverse effect of providing more information and protection to H.B. than for students who have a previously known disability because H.B.'s MDR was conducted with full hindsight and the information produced during the expedited evaluation and eligibility meeting. Again, this effect is at odds with the general requirement of the IDEA that school districts obtain knowledge of a student's disabilities first and then provide a FAPE and corresponding disciplinary protections with full knowledge of those disabilities.

---

15 It is extremely unlikely that a district can determine that a child has a disability within 10 school days if the district is deemed not to have knowledge and subsection (d) applies.

After a school district receives a request for an expedited evaluation after expulsion, it is only required to conduct it in a shorter period than 60 days after the district receives parental consent (which depends on when the parent returns the paperwork), and the eligibility decision need only be made within a "reasonable period of time" after the evaluation. 71 Fed. Reg. 46728 (Aug. 14, 2006). It is not uncommon for evaluations to include several assessments, observations, and signoff by multiple people, depending on the suspected disability. *See* Tenn. Dep't of Educ., *Special Education Evaluation & Eligibility*, https://www.tn.gov/education/families/student-support/special-education/special-education-evaluation-eligibility.html (last visited November 5, 2026.)

The court reverses the ALJ's determination that H.B. became a prevailing party upon the results of the expedited evaluation, eligibility meeting, and MDR. The court denies H.B.'s request for reasonable attorneys' fees under 34 C.F.R. § 300.517(a)(1)(i). RCS requests "reasonable attorneys' fees and costs to the extent permitted by the [IDEA.]" (Member Case Doc. No. 1 at 45.) RCS will remain free to submit further briefing on any attorneys' fees it seeks to request under the IDEA. However, the court will note that the bar for RCS to obtain such fees under 20 U.S.C. § 1415(i)(3)(B)(i)(II)–(III) is high and likely not met in this case.

### C. RCS was not required to conduct a Section 504 MDR for H.B.'s conduct that led to the expulsion because RCS did not have a reasonable suspicion of H.B.'s disability when it expelled her on Apil 9, 2025.

RCS was not required to conduct a Section 504 MDR in this case because RCS did not have a reason to suspect that H.B. had an impairment on April 9, the day that the school proposed and decided to implement a significant change of placement. H.B. does not contest the finding that the school did not have a reason to suspect an impairment at that time but instead argues that the behavior that led to the expulsion and the threat assessment should have given RCS reasonable suspicion of H.B.'s impairment, giving rise to RCS's duty to conduct a post-expulsion Section 504 MDR, and that the expulsion was not a "significant change of placement" until H.B. served ten days of the expulsion period. This argument is not well taken.

Section 504 requires school districts to conduct a Section 504 MDR of "any person who, because of handicap . . . is believed to need special education or related services before taking any action with respect to . . . any subsequent significant change in placement." 34 C.F.R. § 104.35(a). The plain reading of the statute suggests that school districts must conduct a Section 504 MDR before taking any action with respect to expulsion.

H.B. cites to the U.S. Department of Education's July 2022 guidance titled *Supporting Students with Disabilities and Avoiding the Discriminatory Use of Student Discipline under Section 504 of the Rehabilitation Act of 1973* for the proposition that the expulsion and post-expulsion events up to the tenth day should have been considered in determining RCS's duty to conduct a Section 504 MDR. (Lead Case Doc. No. 22 at 16, 19.) However, that guidance and the Tennessee Department of Education's guidance seem to contemplate that the school district's knowledge or suspicion of disability should be assessed when it proposes a disciplinary consequence that itself would be a significant change in placement. *See* U.S. Dep't. of Educ., Office for Civil Rights, *Supporting Students with Disabilities and Avoiding the Discriminatory Use of Student Discipline Under Section 504 of the Rehabilitation Act of 1973* 15 (July 19, 2022), https://www.ed.gov/media/document/504-discipline-guidance-2022-21258.pdf ("Consider, for example, a school that determined through its normal factfinding process that a student with a disability harassed a classmate, and thus proposed to expel the student with a disability. The school would be required to [conduct a Section 504 MDR] to determine if the student's behavior was based on a disability because the expulsion would be a significant change in placement."); *see also* Tenn. Dep't of Educ., *Section 504 Resource Manual* 8 (November 2024), https://www.tn.gov/content/dam/tn/education/legal/Section_504_Resource_Manual.pdf ("As such, the Section 504 review committee/Section 504 team must conduct a manifestation determination when a student with a disability commits a disciplinary infraction that may result in a removal for more than 10 consecutive school days[.] . . .The determination must be based on current information."); *cf.* OSEP Q&A 22-02 ("[A] manifestation determination review must be conducted when school personnel *propose* to change the placement of a child with a disability because of a violation of the school's code of student conduct.") (emphasis added).

While IDEA and Section 504 claims can be judged separately, since impairment under Section 504 is defined more broadly than disabilities under the IDEA, H.B. cites no supportive legal authority for the proposition that the claims should be evaluated differently such that post-expulsion events should be considered in her Section 504 claim.[16]

## V. CONCLUSION

For the reasons stated above, RCS's Motion for Judgment on the Administrative Record will be granted, and H.B.'s Motion for Judgment on the Administrative Record will be denied.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

[16] While H.B. repeatedly argues that the ALJ "skipped the 504 analysis," the ALJ made it abundantly clear that he found that RCS had neither a basis of knowledge of H.B.'s disability under the IDEA, nor a "reason to suspect" H.B.'s disability under Section 504 before expelling her. (T.R. at 1036–1037.)

The court also notes that H.B. appears to be raising a new Section 504 child find claim that arose after the events on April 9 and 11, 2025, but fashioning it as a failure to conduct a Section 504 MDR. The court will not address whether this claim has been properly exhausted because RCS has conducted a Section 504 evaluation and an MDR for H.B.